COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| SAMUEL MUELA, | | No. 08-09-00140-CV |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 384th District Court |
| | § | |
| ELVIA GOMEZ, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC # 2000-2101) |
| | § | |

## **O P I N I O N**

This appeal arises from a judgment for damages resulting from a vicious attack by a pit bull. Following a bench trial, the trial court found that Samuel Muela and his mother were jointly and severally liable to Elvia Gomez for damages in the amount of $30,279.45. Only Samuel appeals, complaining that the evidence is legally insufficient to prove that he owned or possessed the pit bull and had actual or constructive knowledge of the dog's propensity toward violence. We reverse the judgment in part and render judgment that Elvia Gomez take nothing against Samuel.

## **FACTUAL BACKGROUND**

On June 27, 1998, a pit bull attacked Elvia Gomez while she rode bicycles with her five-year-old daughter and seven-year-old son near their home in Socorro, Texas. As they neared the mobile home of Samuel's parents--Celia and Simon--a black dog and a brown pit bull ran out from beneath it. Gomez told her son to run for his father, Jaime Hernandez. Gomez lifted her daughter into the air and tried to position her bike to block the dogs. When the pit bull attacked, Gomez tried in vain to fight him off with her hands. The dog latched onto her leg and she could not pry him loose. Neighbors arrived to help and threw rocks at the animal. The attack lasted approximately ten

minutes. When the dog let go of his grip on Gomez, he ran straight back to the same mobile home. Gomez was driven to the hospital by her husband.

The following day, Hernandez accompanied an animal control officer to Celia's mobile home. They found the pit bull and retrieved him from beneath the trailer. The dog wore tags and a collar, although Gomez had not been able to see a name during the attack. Hernandez testified that he and the animal control officer heard footsteps from inside, but no one ever answered the door. The officer left a citation and took the dog into custody.[1]

Samuel and Celia testified, as did Samuel's sister, Simona. All three acknowledged that Celia and Simon had a black dog living with them but the dog was always tied up in the yard whenever they were away. They had never owned a pit bull and had never seen the dog responsible for the attack. At the time of the incident, Simona lived in East Texas with her husband. Samuel had married and moved from the family home some years prior. Only Celia and Simon lived at the mobile home, but the couple were on away on a week-long trip to Mexico. Celia learned of the incident from her son.

Samuel testified that at the time of the attack he lived with his wife in Clint, Texas. While his parents were in Mexico, he visited their home every evening to feed the black dog but he never saw the pit bull. He first learned of the incident when a neighbor called his cell phone and told him an animal control officer was at his parents' trailer concerning a canine attack.

Gomez suffered injuries to fingers on both of her hands. Doctors were able to re-attach the tip of her right index finger, but the tip of her left middle finger had to be amputated. During the attack, the dog also sunk its teeth into Gomez's lower leg, breaking off a tooth in the process. The

---

[1] The day after the dog was seized, animal control also issued a warning notice to the occupant of 11197 Sheffield indicating that an impounded dog was "possibly yours." The Muelas lived at 11152 Sheffield. The animal was eventually euthanized.

injury to her leg was described in the medical reports as, "a large complex laceration with loss of skin and tendons." A skin graft was used to repair the leg wound.

Gomez remained in the hospital for four days and then continued her recovery with outpatient rehabilitation treatments. Medical bills totaled $18,234.25. Because of the injuries, she suffered from constant pain and loss of sleep for approximately six months. Hernandez testified as to the effect of her injuries on her life as a mother, wife, and teacher.

Originally Gomez brought suit against Simon, Celia, Simona, and Samuel. Simon passed away prior to trial. No judgment was rendered against Simona. As we have mentioned, this appeal is brought only by Samuel, who challenges the legal sufficiency of the evidence to prove negligence.

## STANDARD OF REVIEW

This appeal proceeds without benefit of formal findings of fact and conclusions of law. TEX.R.CIV.P. 296. In their absence, the judgment of the trial court must be affirmed if it can be upheld on any available legal theory that finds support in the evidence. *Point Lookout West, Inc. v. Whorton,* 742 S.W.2d 277, 278 (Tex. 1987), *In the Interest of W.E.R.,* 669 S.W.2d 716, 717 (Tex. 1984); *Temperature Systems, Inc. v. Bill Pepper, Inc.,* 854 S.W.2d 669, 372-73 (Tex.App.--Dallas 1993, writ dism'd). Absent findings of fact, it doesn't make any difference whether the trial court selected the right approach or theory. If the appellate court determines the evidence supports a theory raised by the pleadings or tried by consent, then it is presumed that the trial court made the necessary findings and conclusions to support a recovery on that theory. *Lemons v. EMW Mfg. Co.,* 747 S.W.2d 372 (Tex. 1988). These presumptions are tantamount to implied findings and can be challenged by legal and factual insufficiency points, provided a reporter's record is brought forward.

A legal sufficiency or "no evidence" challenge is a question of law. *Serrano v. Union Planters Bank, N.A.*, 162 S.W.3d 576, 579 (Tex.App.--El Paso 2004, pet. denied). When the party

without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." *Trujillo v. Carrasco*, 318 S.W.3d 455, 459 (Tex.App.--El Paso 2010, no pet.), *citing Serrano,* 162 S.W.3d at 579. A legal sufficiency challenge will be sustained on appeal if the record shows: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *El Paso Independent School District v. Pabon*, 214 S.W.3d 37, 41 (Tex.App.--El Paso 2006, no pet.); *Trujillo*, 318 S.W.3d at 459. We credit evidence favorable to the finding if a reasonable fact finder could do so, disregard contrary evidence unless a reasonable fact finder could not do so, and reverse the fact finder's determination only if the evidence presented would not enable a reasonable and fair-minded person to reach the judgment under review. *City of Keller*, 168 S.W.3d at 827; *Pabon*, 214 S.W.3d at 41. When a no-evidence point rests on the competency of the evidence, we may not disregard contrary evidence showing it to be incompetent. *City of Keller*, 168 S.W.3d at 812; *Pabon*, 214 S.W.3d at 41.

Although we indulge every reasonable inference that would support the verdict, if the evidence allows only one inference, neither the trier of fact nor the reviewing court may disregard it. *See City of Keller*, 168 S.W.3d at 821-22; *Pabon*, 214 S.W.3d at 41. We are mindful that the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819. When there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts. *Id*. at 820. If more than a scintilla of evidence exists to support the finding, the evidence is legally sufficient. *Ratsavong v. Menevilay*, 176 S.W.3d 661, 667-68 (Tex.App.--El Paso 2005, pet. denied). More than a scintilla of evidence exists where the evidence

presented, as a whole, rises to the level that would enable reasonable and fair-minded people to differ in their conclusions. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004); *Ratsavong*, 176 S.W.3d at 668, *citing Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). We are also guided by the equal inference rule: when circumstantial evidence presents two equally plausible, but opposite inferences, neither can be inferred. *See Wal-Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936 (Tex. 1998); *Litton Industrial Products, Inc. v. Gammage*, 668 S.W.2d 319, 324 (Tex. 1984). When circumstantial evidence is so slight that the choice between opposing plausible inferences amounts to nothing more than speculation, it is legally no evidence at all. *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001).

## NEGLIGENCE

The Texas Supreme Court has determined that negligence can be a correct theory of recovery in a personal injury action involving an animal.[2] *Marshall v. Ranne*, 511 S.W.2d 255, 258-59 (Tex. 1974); *see also Allen ex rel. B.A. v. Albin*, 97 S.W.3d 655, 665 (Tex.App.--Waco 2002, no pet.). To recover on a negligent handling claim, a plaintiff must prove: (1) the defendant owned or possessed an animal; (2) the defendant owed a duty to exercise reasonable care to prevent the animal from injuring others; (3) the defendant breached that duty; and (4) the defendant's breach proximately caused plaintiff's injury. *Allen*, 97 S.W.3d at 660. Unlike strict liability claims, to prevail in a negligence action the plaintiff does not have to prove that the animal was vicious or dangerous. *Id*.; *Dunnings v. Castro*, 881 S.W.2d 559, 562-63 (Tex.App.--Houston [1st Dist.] 1994, writ dism'd). The Restatement (Second) of Torts states:

---

[2] A person injured by a dog bite may sue the owner in strict liability or negligence. An owner of a vicious animal may be strictly liable for damages while an owner of a non-vicious dog may be liable for negligent handling. *Bushnell v. Mott*, 254 S.W.3d 451, 452 (Tex. 2008). Gomez pled both theories of recovery. Although the trial court did not enter formal findings of fact, the judgment recites that "the dog bite . . . was proximately caused by the negligence of . . . CELIA MUELA and SAMUEL MUELA."

> [O]ne who possesses or harbors a domestic animal that he does not know or have
> reason to know to be abnormally dangerous, is subject to liability for harm done by
> the animal if, but only if, (a) he intentionally causes the animal to do the harm, or (b)
> he is negligent in failing to prevent the harm.

Restatement (Second) of Torts § 518 (1977); *see also Allen*, 97 S.W.3d at 665.[3]  Thus, a dog owner

may be liable for injuries caused by the dog even if the animal is not vicious, so long as the plaintiff

can prove the owner's negligent handling or keeping of the animal caused the injury.  *Dunnings*, 881

S.W.2d at 562-63.  Liability may also arise for injuries the dog inflicts while off the owner's property

if it is shown that the owner had actual or constructive knowledge that would "put a person of

ordinary prudence on notice that permitting his dog to run at large might cause injury to another."

*Dakan v. Humphreys*, 190 S.W.2d 371, 373 (Tex.Civ.App--Eastland 1945, no writ), *disapproved on

other grounds by Marshall v. Ranne*, 511 S.W.2d 255, 257-58 (Tex. 1974).

### DUTY

The threshold inquiry in a negligence case is duty.  *El Chico Corp. v. Poole*, 732 S.W.2d 306,

311 (Tex. 1987).  The plaintiff must establish both the existence and the violation of a duty owed

to the plaintiff by the defendant to establish liability in tort.  *Id*.  Duty is a question of law for the

court to decide.  *Thapar v. Zezulka*, 994 S.W.2d 635, 637 (Tex. 1999).

In *Marshall*, the Texas Supreme Court recognized a duty owed by the owner or possessor of

---

[3]  In *Marshall*, the Texas Supreme Court adopted Section 518 of the First Statement which provides:

> [O]ne who possesses or harbors a domestic animal, which he does not have reason to know to be
> abnormally dangerous but which is likely to do harm unless controlled, is subject to liability for harm
> done by such animal if, but only if, (a) he fails to exercise reasonable care to confine or otherwise
> control it, and (b) the harm is of a sort which it is normal for animals of its class to do.

Restatement of Torts § 518 (1938); *see also Marshall*, 511 S.W.2d at 259.  In 1977, three years after the Court decided
*Marshall*, the American Law Institute published the Restatement (Second) of Torts.  Because the *Marshall* Court cited
Section 518 with approval, courts (such as the Waco Court of Appeal in *Allen*) look to Section 518 of the Second
Restatement for an explanation of the duty owed to others by an owner of a domestic animal.  *See Allen*, 97 S.W.3d at
665.

a non-vicious animal to exercise reasonable care to prevent the animal from injuring others. *Marshall*, 511 S.W.2d at 258, *citing* Restatement (Second) of Torts § 518 (1938); *see also Allen*, 97 S.W.3d at 660. Whether a duty exists depends on some degree of proof that the risk of injury from a dog bite is foreseeable, or stated differently, whether the owner had actual or constructive knowledge of the danger presented by the dog. *See Dunnings*, 881 S.W.2d at 563-64. Foreseeability is satisfied by showing a person of ordinary intelligence should have anticipated the danger to others by the actor's negligent behavior. *Searcy v. Brown*, 607 S.W.2d 937, 942 (Tex.Civ.App. 1980).

## THE EVIDENCE

In Issue One, Samuel complains that the evidence is legally insufficient to prove he owned or had possession of the pit bull at the time of the attack. The reporter's record is replete with differing testimony on almost every detail. The few undisputed facts establish that at the time of the attack: (1) Celia and Simon lived in a trailer home on Sheffield Street; (2) they owned a black dog; (3) they were out of town; and (4) Samuel stopped by daily to feed the black dog.

Gomez testified that two dogs, a black one and the pit bull who attacked her, ran directly from the Muelas' trailer and that after the neighbors pried the dog loose, he ran straight back to the same trailer. Gomez claimed that she passed by the Muelas' trailer daily and frequently saw the pit bull there. According to her, the dog had a reputation for being "pretty aggressive" and had attacked one time previously, although the neighbor was not bitten. Hernandez had also seen the pit bull before and believed it lived at the Muelas' trailer. The pit bull was not tied up or restrained, but the Muelas did tie up their pet black dog. And while Hernandez explained that the animal control officer found the pit bull beneath the trailer, Celia insisted that there was no crawl space whatsoever. The animal control officer did not testify, nor were photographs of the mobile home admitted into evidence. Although the dog wore a collar and tags indicating that it belonged to someone--as

opposed to being homeless--no evidence of licensing, micro-chipping, or registration was offered.[4]

The trial judge is the sole judge of the credibility and weight to give testimony and as such is free to accept or reject any or all of the testimony offered. *See City of Keller*, 168 S.W.3d at 819-20. There was plenty of innuendo that Simon was involved in cock fighting and dog fighting. At the beginning of the trial, plaintiff's counsel told the court, "Now these defendants who claim not to own any pit bulls, they not only owned the pit bull, they fought the pit bull and they also fought fighting cocks. And everybody knows that." Hernandez testified that friends told him that Simon had a pit bull for dog fighting. He also claimed to have seen roosters in the Muelas' yard. Simona said her father did not raise cock-fighting roosters but had hens and baby chicks which were kept in a wire chicken coop. Celia denied that they ever had chickens or a chicken coop. She also denied that Simon was ever in the cock fighting business. No one even suggested that Samuel engaged in dog fighting or cock fighting. Based on the testimony offered, the trial judge could have reasonably believed the pit bull lived at the Muelas' trailer and therefore was owned by Celia. The same cannot be said of Samuel.

## Did He Live There?

There is no evidence, direct or circumstantial, that Samuel owned the property. There was conflicting evidence as to whether he resided at the trailer at the time of the attack. Hernandez testified that he went to high school with Samuel, that Samuel was never married, and that he never moved out of the family home. In direct contradiction, Samuel testified that he moved out of the home on Sheffield and that on the day of the attack, he lived with his wife in Clint, Texas. Simona and Celia also testified that Samuel lived in Clint. Hernandez claimed that Samuel's Ford pickup was at the trailer at the time of the attack, but Samuel did not drive a pickup although his father did.

---

[4] Plaintiff's counsel referred to it as "a well-groomed-somebody-loves-him pit bull."

Gomez posits in her briefing that if Samuel and Simona did not live in the trailer with their parents, there was no reason to be adding on to it as Hernandez described. Yet as a neighbor who passed the Muelas' home regularly, she was nevertheless unable to recognize Simona in the courtroom. When defense counsel attempted to call Samuel's wife to the stand, the trial judge refused to allow her to testify noting that, "I can be confident as to what she will say; it'd be surprising for her to contradict her husband, so I'll just leave it at that." By expecting Samuel's wife to corroborate his testimony, the court apparently accepted as true that the couple lived in Clint. Hernandez's testimony offers nothing but the possibility of an equal inference. We thus conclude there is no evidence that Samuel lived at the trailer or owned the pit bull.

### Did He Possess the Pit Bull?

Admittedly, Samuel visited his parents' home nightly to feed their pet dog. There was no direct evidence that he had ever seen the pit bull or knew of its existence. Gomez points to the fact that neighbors called Samuel on his cell phone to tell him of the attack. In her briefing, she characterizes the testimony as neighbors calling to advise Samuel "that the dog catcher had taken his pit bull to the pound" after the attack. The actual testimony was that the neighbors had Samuel's cell phone number and called to tell him that the dog catcher was at his parents' home because they knew Celia and Simon were not there. These neighbors thought that the Muelas' dog had bitten Gomez, but when Samuel went over to the trailer to check, the black dog was there. When asked why the neighbors would call him, Samuel explained that they knew he was watching his parents' home. The call makes even more sense considering Gomez testified that the black dog accompanied the pit bull as it raced toward her, although it did not participate in the mauling.

There is no evidence Samuel owned the lot from which the dog escaped. There is no evidence that he stayed at the house overnight or for long periods of time. There is no evidence that

Samuel interacted with the pit bull or fed the pit bull. There is thus no evidence from which to infer that he controlled the pit bull. We sustain Issue One. Because of our disposition, it is unnecessary to consider the remaining point of error. Accordingly, we reverse and render judgment that Gomez take nothing against Samuel.

February 23, 2011

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.