

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-22-00217-CV

———————————————————

PAUL HERCHMAN JR., DONNA HERCHMAN, AND PAUL HERCHMAN III,
Appellants

V.

BRITTNEY LEE, Appellee

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-293088-17

Dissenting Memorandum Opinion by Justice Bassel

## DISSENTING MEMORANDUM OPINION

### I.  Introduction

I would sustain Appellants Paul Herchman Jr., Donna Herchman, and Paul (Trace) Herchman III's issue in which they challenge the sufficiency of the evidence to support the finding that the dog had "dangerous propensities abnormal to its class" and the finding of negligence.[1]  After reviewing the record and applying the appropriate standards of review, I would hold that the evidence is legally sufficient but factually insufficient to support the jury's dangerous-dog finding and the negligence finding.  Therefore, I respectfully dissent and would grant relief by reversing the judgment and remanding the case for a new trial.

The majority opinion provides appropriate background of the facts, so I will move directly to an explanation of why I dissent.

### II.  Sufficiency of the Evidence

In their first issue, Appellants argue as to the strict-liability claim that "[t]here is legally and factually insufficient evidence that Jake's general character was abnormally dangerous for a dog."[2]  As I discuss in more detail below, because there is more than

---

[1]I will follow the majority's course in the use of first names.  Because the three Appellants share the same last name, I refer to them by their first names.  And for consistency, I refer to all of the other witnesses (except the veterinarian) by their first names as well.

[2]Appellants filed a motion for new trial in which they argued that "the evidence is factually insufficient to support the jury's findings in Question 1, which asked whether the dog had dangerous propensities abnormal to its class."  At the hearing on

a scintilla of evidence to support the jury's dangerous-dog finding but because the evidence supporting the finding is so weak or is so against the great weight and preponderance of the evidence that the finding is manifestly unjust, I conclude that the evidence is legally sufficient but factually insufficient as to Brittney's strict-liability claim.

Additionally, within their first issue, Appellants argue that the negligence finding should be set aside because the evidence is legally and factually insufficient to support the duty, breach, and causation elements of Brittney's negligence claim. Because knowledge of the dog's dangerous propensities comes into play with a negligence claim if the injury occurred where the dog had a right to be—as is the case here because the dog was in the owners' backyard—and because I would hold that there is legally sufficient but factually insufficient evidence to support the dangerous-dog finding, I similarly conclude that there is legally sufficient but factually insufficient evidence as to Brittney's claim against Appellants for negligent handling of an animal.[3]

_____

the motion for new trial, there was only a brief mention of the legal- and factual-sufficiency challenges to the sufficiency of the evidence; the focus of the hearing was on the joint-and-several liability issue, the evidentiary challenges, and the excess-damages issue.

[3]The majority opinion appropriately sets out the applicable legal- and factual-sufficiency standards of review.

### A. Law on Recovering on a Claim of Strict Liability for an Injury by a Dangerous Domesticated Animal

I am not in disagreement with the majority on the standards that apply to the liability questions in issue but set out those standards to lend context to the discussion that follows. To recover on a claim of strict liability for injury by a dangerous domesticated animal, Brittney had to prove (1) that Appellants were owners or possessors of Jake, (2) that Jake had dangerous propensities abnormal to his class, (3) that Appellants knew or had reason to know that Jake had dangerous propensities, and (4) that those propensities were a producing cause of Brittney's injuries. *See Marshall v. Ranne*, 511 S.W.2d 255, 258 (Tex. 1974) (approving rule in Restatement (First) of Torts § 509 (Am. L. Inst. 1938) that "a possessor of a domestic animal which he has reason to know has dangerous propensities abnormal to its class, is subject to liability for harm caused thereby to others, except trespassers on his land, although he has exercised the utmost care to prevent it from doing the harm").[4]

---

[4]Although the suit here was not brought pursuant to the Texas Health & Safety Code, I note that the subchapter on dangerous dogs includes the following helpful definition:

"Dangerous dog" means a dog that[]

(A) makes an unprovoked attack on a person that causes bodily injury and occurs in a place other than an enclosure in which the dog was being kept and that was reasonably certain to prevent the dog from leaving the enclosure on its own or

(B) commits unprovoked acts in a place other than an enclosure in which the dog was being kept and that was reasonably certain to

**B. Law on Recovering on a Claim for Negligent Handling of an Animal**

I borrow from the Austin Court of Appeals's summary of the law on negligent

handling of an animal:

> "To recover on a claim of negligent handling of an animal, a plaintiff must prove[] (1) the defendant was the owner or possessor of an animal[,] (2) the defendant owed a duty to exercise reasonable care to prevent the animal from injuring others[,] (3) the defendant breached that duty[,] and (4) the defendant's breach proximately caused the plaintiff's injury." *Thompson v. Curtis*, 127 S.W.3d 446, 451 (Tex. App.—Dallas 2004, no pet.). As in any negligence case, the threshold inquiry in a negligent handling case is whether there is a duty. *Muela v. Gomez*, 343 S.W.3d 491, 497 (Tex. App.—El Paso 2011, no pet.). "Whether a duty exists depends on some degree of proof that the risk of injury from a dog bite is foreseeable, or stated differently, whether the owner had actual or constructive knowledge of the danger presented by the dog. Foreseeability is satisfied by showing a person of ordinary intelligence should have anticipated the danger to others by the actor's negligent behavior." *Id.* (citations omitted). "A party should not be held responsible for the consequences of an act that cannot be reasonably foreseen, and there is no duty to warn of danger when no danger is anticipated." *Labaj v. Van[H]outen*, 322 S.W.3d 416, 421 (Tex. App.—Amarillo 2010, pet. denied).

*Rodriguez v. Reed*, No. 03-11-00523-CV, 2013 WL 3186191, at *3 (Tex. App.—Austin

June 19, 2013, no pet.) (mem. op.). Moreover, the owner of a domestic animal is not

---

prevent the dog from leaving the enclosure on its own and those acts cause a person to reasonably believe that the dog will attack and cause bodily injury to that person.

Tex. Health & Safety Code Ann. § 822.041(2); *cf. City of Houston v. Jenkins*, 363 S.W.3d 808, 816–17 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (looking to the dangerous-dog statutes in Section 822 of the Texas Health and Safety Code, in addition to *Marshall* and Section 509 of the Restatement, in determining the scope of the duty in a suit for negligent handling of an animal).

liable for "injuries caused by it in a place where it has a right to be" unless the owner knew or should have known of the vicious or unruly nature of the animal. *Jones v. Gill*, No. 2-03-298-CV, 2005 WL 503182, at *4 (Tex. App.—Fort Worth Mar. 3, 2005, no pet.) (mem. op.) (collecting cases with this holding).

## C. Relevant Evidence

### 1. Paul's Testimony

Paul testified that Donna's friend knew Tammy Stierwalt, who was Jake's previous owner and the owner of a day care, and mentioned that she wanted to find a new home for a dog. Paul went to Tammy's house to meet Jake. Tammy told him that she had chosen to give up Jake. At trial, Paul was asked, "And did you know that [Jake] had mauled a kid in a day care?" He responded, "No. Maul? I did not." Paul said that Tammy had told him that Jake had bitten someone. Brittney's counsel further questioned Paul on his understanding of the situation involving the child who was bitten:

> Q. And [Tammy] told you that the dog [had] bit[ten] the kid and [that the kid] had rips on [his] head and mouth[?]
>
> A. Absolutely not.
>
> Q. Did she tell you that the kid had stitches on [his] face?
>
> A. No.
>
> Q. Did she lie to you? Did she cover that up? Did she say, "Well, it just nipped somebody"?

6

A.  Pretty much that the kid -- this kid got on the dog's back, wrapped his arms and legs around the dog and that the kid was a bit of a problem, and that [the dog], in defense, to get the child off his back, nipped [the child].

Paul's understanding from Tammy was that the child had been bitten on the lip; Tammy did not mention to him that "the rip was on both sides of the lips."

Tammy did not tell Paul that the dog was dangerous.  When Brittney's counsel questioned him about whether the dog was abnormal, Paul thought that the dog's behavior toward the child was a normal reaction:

Q.  Okay.  Would you agree, [Paul], at least with this basic proposition, that a dog that -- whatever a kid does to it -- that bites its face bad enough to leave stitches is not a normal dog?

A.  You know, based upon my little dog, who has also nipped at people[,] . . . [a]t that time, my feeling was dogs will defend themselves.

Q.  Okay.  But we're talking about biting in the face and leaving scars and stitches.

Do you think a dog that does something like that is a normal dog?

A.  Well, as I mentioned to you, in defense.

And I wasn't aware of scars and stitches.  I had no idea of that.

So I could see a dog wanting to get a small child off its back.  I think any dog would probably want to get a child off [its] back.

Paul was also questioned about an incident when Jake had bitten his daughter LeAnn.  Paul explained that he was not at home when the incident occurred, but

7

[i]t was relayed to [him] that [his] daughter, who didn't live there, came in the front door, . . . and she got the dog riled up and got, you know -- apparently chasing squirrels or looking for squirrels, which he was kind of, you know, crazy about squirrels. And so then he stood up on her, and then she tried to get him down and slapped at him, and he -- and then she kicked him.

. . . .

. . . And then when she slapped at him and kicked at him, that -- that's when he reacted.

Paul reported the incident, and Jake was quarantined for approximately ten days with animal control in Grapevine. Paul said that there was no dangerous-dog hearing and that he was not required to put up any special signs after this incident.

Paul called Tammy to inform her of the incident and to find out the name of the veterinarian to whom she had previously taken Jake. Brittney's attorney further questioned Paul about what had transpired during the call:

Q. Did Tammy . . . at that point break down and start crying on the phone with you?

A. She did.

Q. And did she tell you -- plead with you: "Put the dog down! Put the dog down! It's already bitten a child; now it's bitten your own daughter! Put the dog down!" Did she say those words?

A. That's not the way I recall it. She said: "Do what you need to do. And if you feel like you need to put the dog down, then I understand."

Paul testified about picking up Jake from animal control and explained why he had decided not to euthanize Jake after this incident:

8

When I went to pick the dog up and spoke to the keeper and asked him how it went and how he behaved and, you know, that -- what he thought about it and that we were considering, you know, what we needed to do, he said -- he told me -- he said[,] "Well, if you're going to put the dog down, don't do it, because I would like the dog."

Q. Okay. So is that why you didn't put the dog down?

A. You know, we were considering what to do after that. And I was certainly considering that. That's why I called the vet and spoke -- you know, spoke to the vet. We talked to, you know, the place where he was groomed and where they -- you know, when they would go out of town -- for years. . . . And I talked to the animal control person as well, and . . . his closing comment to me was if we were going to consider that, that he would like us to consider letting him take the dog[] because he thought the dog was a good dog.

Paul said that after Jake bit his daughter, they "were more careful" and tried "to keep him isolated." If they had a guest that Jake was unfamiliar with, they tried to put him in the backyard or tried to keep him calm.

With regard to the incident involving Brittney, Paul was not at home when the incident occurred. Paul's understanding was that Brittney was on a bench, that she had reached over Jake to grab her wine glass, and that Jake had bitten her. Brittney's counsel used the phrasing "that she was 'savagely mauled in the face,'" but Paul disagreed with that characterization. Paul said, "She was bitten. I don't know, you know, mauled. It was not good." When Trace called and told him that Jake had bitten Brittney in the face, Paul told Trace to take her to the emergency room. Paul also told Trace to call the city and have them pick up Jake to be euthanized.

9

Brittney's counsel questioned Paul about whether Jake, who had "sent three people to the hospital," was abnormally dangerous. Paul agreed that the three incidents were not normal, but he did not agree that the incidents made Jake abnormally dangerous.

### 2. Trace's Testimony

When Trace was asked whether he had observed Jake to be aggressive toward any individuals, he said that Jake had barked at delivery men and squirrels but that he had not shown aggression toward any guests. Trace had taken Jake on walks and said that "he was pretty good on walks" and did not bark at other dogs. Trace had never seen Jake bite their smaller dog Lexi or be aggressive toward her. No one had ever expressed to Trace that Jake was dangerous.

Trace testified that he was dating Brittney at the time of the dog-biting incident. On the night in question, they went out on a date and then came to Trace's parents' house where he was staying at the time. They got a bottle of wine and went outside. They sat on a bench on the patio with Brittney's head at one end and her feet in Trace's lap on the other end of the bench. Trace said that they had been petting Jake while they sat on the patio and that Jake had been going back and forth between sleeping by Trace's feet and putting his head in Trace's lap. Jake did not show any aggression toward Brittney; he did not bark or growl at her.[5] Trace explained that

---

[5]Trace could not recall how long they had been at the house before the incident happened but said that they "had not just arrived."

10

right before Jake bit Brittney, she reached for her wine glass. Trace testified that he did not "think that there was any provocation except for maybe moving a little too quickly and startling the dog." When asked whether the dog went after Brittney's face, Trace said, "It was very fast. And he went after the first -- closest object."

Trace was aware that Jake had bitten his sister before he had bitten Brittney. Trace did not agree that Jake had attacked his sister's friend when she came in the house. Instead, Trace believed that Jake had jumped on his sister's friend (prior to his sister's pushing and kicking Jake to get him off her friend) because he was excited; Trace did not believe that Jake's behavior was violent or aggressive. Trace had spoken with his sister, who had taken full responsibility for her actions and believed that the bite was her fault. Trace thought that Jake's response was not abnormal for the way that he had been treated by his sister; he explained that his sister had "used force to get the dog off in an unreasonable manner . . . and that the dog [had] reacted."

### 3. Donna's Testimony

Donna said that when Tammy had brought Jake to the Herchman home for a visit, she had told her about the dog bite that had occurred at her day care:

> [S]he had had a rambunctious three-year-old child who had been there the entire time, she had raised Jake from a puppy for five years, and that he had jumped on the back -- on Jake's back and [had] pulled his ears and [had] wrapped his legs [around Jake] and [had] tried to ride him.
>
> Q. Did she tell you that Jake had bitten a child in the face and --

11

A.  Yes.

Q.  -- left scars?

A.  She said he turned around and bit the child on the lip.

Q.  Did she tell you it was on both sides or it was also above his ears --

A.  She never said anything to me that day about anything on the head.  It was a bite on the lip.

Donna testified about the second biting incident, which involved her daughter.

When asked if it was her understanding that her daughter LeAnn was protecting her

friend from being attacked by Jake, she explained what she knew about the event:

My understanding is that --

Well, for one thing, I didn't see it.  I was in the shower and did not hear anything.

And he had curled up outside my door.

I did not know my daughter and her roommate -- They both lived in Dallas.  I did not know they were coming to the home at all.  It was a Sunday afternoon.

What she has told me, since I didn't witness it, was that . . . she and [her friend] McKenzie came in the door.  She wanted to show McKenzie Jake's tricks, which were basically run through our doggy door that we had had inserted in our glass door and tell him to "Go get the squirrels!" and then come back in, "Go get the squirrels!" and come back in.  And that was -- He didn't bring squirrels in; that was just his running out, running in.  And about the third time he came in, he started to jump up on shoulders, no growling, no nothing, and she pushed him away -- on McKenzie's shoulders.  She just pushed him -- with her hand -- away.

Q.  Did you know that she -- your daughter -- kicked the dog?

12

A.  This is what -- She pushed him away.  He bit her.  So to get -- While -- Since she was being bit, she kicked him in the chest to get him back, and then he stopped and -- No.  Then he bit her again in the arm, I believe -- I think it was here first and then maybe her arm -- and then stopped.  And when they ran out the door, he came back and curled up at my bedroom door.  That's when my phone was ringing[,] and I came out and saw him there.  They were outside.

Donna summarized that LeAnn had pushed Jake so that he would not jump on McKenzie's shoulders and that he had bitten LeAnn's hand; LeAnn then kicked him in the chest, and he bit her arm.  LeAnn told Donna that she had gotten Jake "totally riled up" but that he was not about to bite McKenzie; instead, "[h]e had just run back in and [had] tried to jump up on her shoulders or was going up to jump on her shoulders."

Brittney's counsel questioned Donna about whether she considered Jake's behavior to be abnormally dangerous in light of the second bite:

Q.  Okay.  But at least at this point, you know that this dog has some kind of trigger and there's something that's abnormal about the dog.  Would you agree?

A.  At this point, yes, I will say there was something abnormal.

Q.  It's abnormally dangerous, and you don't know exactly what triggers it.  Fair to say?

A.  Well, it seems like -- What I knew at the time was, from a little boy jumping on him and then my daughter aggressively slapping him away, --

Q.  Okay.

A.  -- if that's triggers, yes.

13

Q. Would you agree that that's not normal: for a dog to react by biting the way that this dog did?

A. I guess it would depend on the dog. I know our little -- I know our little dog maybe nipped before, but her teeth were this big. So that's a bigger dog. And I don't know that it's abnormal.

Q. Well, a little dog is not very dangerous[] because it has little-bitty teeth, right?

A. Right.

And a bigger dog is dangerous[] because it has bigger teeth.

Q. So if you have a bigger dog that has bigger jaws, bigger teeth, it can do a lot more damage, right?

A. Right. But I'm not saying it's abnormal.

. . . .

Q. Okay. So don't you think that that makes this dog abnormally dangerous?

A. Yes. After those incidences, I would -- I mean, "abnormally dangerous"? "Cautious" is what I would say with the dog.

Q. Okay. You knew you had to be cautious and careful with this dog because it was at least unpredictable, right?

A. Right. Cautious and smart.

As for how they had handled Jake after the incident with LeAnn and her roommate, Donna said that they started putting him outside if they knew a repairman

14

or someone they did not know well was coming over;[6] they did not just let him run to the door and greet people.

Donna was recalled during the defense's case in chief. She testified about various photos that showed Jake with different people. Donna described Jake as a lapdog who always wanted to be petted, and she said that despite the size difference between Jake and their Maltipoo Lexi, Lexi was the alpha dog. Donna said that a woman who was like a daughter to her had brought her young daughters over on the weekends "a lot," and a photo was admitted into evidence showing one of the girls holding the leash for Jake and Lexi while they were on a walk.[7] Donna testified that if she had any concerns about whether Jake or Lexi would have been safe around the children, she would not have had them around the girls. She said that Paul would often tether the dogs in the front yard while he did yard work and that Jake did not show any aggression (e.g., growl, snarl, or bark viciously) if someone approached. Donna agreed that Jake would bark at delivery people, but she said that "Lexi was the mo[re] active barker of the two." A video was introduced during which LeAnn yelled "Go get the duck!"—similar to the incident in which she had told Jake, "Go get the squirrel!" and had been bitten—and it showed that Lexi was the "lead barker" and that Jake stood calmly, never pulled on the leash, and only barked a few times.

---

[6]Donna said that Jake interacted well with all their friends.

[7]The photo did not have a date on it, and Donna did not know when it was taken, but she believed that the young girl had probably been around Jake after the second bite.

Appellants' counsel asked Donna if she recalled that after LeAnn was bitten by Jake, Paul had contacted the vet that Tammy had used. Donna said that she did and that afterwards, from what she could remember, Paul said that the vet had said that Jake was a fear biter and that they should probably get him neutered because that would help. Donna recalled that they had gotten Jake from Tammy in May 2012; that he had bitten LeAnn on August 12, 2012; and that he was neutered on August 23, 2012, after he completed his time in quarantine.

### 4. Tammy's Testimony

Tammy testified that she had Jake in her home for over five years and that he "grew up with all the children in [her] day care, with multiple people in and out of [her] house." She said that he was always a well-behaved dog and had played with the kids during recess. She said that in the mornings when kids were being dropped off, she would tell Jake, "Place," and he would go to his place and stay there until he was released.

Brittney's counsel questioned Tammy about an incident in which Jake had chased a friend of hers to his truck and ripped his shorts, causing the man to jump into his truck. When Appellants' counsel explored this incident in more detail, Tammy said that the man's children attended her day care and that he was a regular visitor. She explained that what was different on the day this incident occurred was that the man had come to the door wearing a ball cap and very dark sunglasses; the children answered the door before she did; and "Jake didn't recognize him" and gave

16

chase. She called Jake, and he immediately came back into the house. When the man came back to the door to pick up his children, Tammy apologized profusely, and the man said, "Don't apologize. Your dog did exactly what I would have wanted my dog to do. Your dog was protecting my child in your care."[8]

Brittney's counsel also questioned Tammy about the incident in which Jake had bitten a three- or four-year-old boy at her day care. She said that

> [t]he child had gotten on top of [Jake's] back and [had] wrapped his legs around his stomach area and his arms around his back -- his neck and was riding him like a horse. But from what his -- The child who was bit, his older sister was also in my care, and she said that the little boy would not get off his back; and Jake was bucking like a horse trying to get him off, but he couldn't shake him off of his back; the little boy would not release.

She explained that the boy had rips on both sides of his mouth, which required stitches, and a small cut above his ear. Tammy reported the incident to the state regulatory agency that governed her day care, and they said that she did "not have to get rid of the dog because the mother admitted that her child had done wrong[ and] because she [had] talked to her older daughter as well and the daughter [had] explained what had occurred." The regulatory agency did not make Tammy close her day care for even one day. Tammy said that no one—not the vet, the state regulatory agency, the city, or anyone else—had told her that she needed to euthanize Jake after the child had been bitten. Instead, the people who worked at animal control fell in love with Jake while he was in quarantine and told her that when she picked him up.

---

[8]There is no indication in the record that Appellants knew of this incident.

However, the event was traumatic to her and caused her to find a new home for Jake, close her day care, and pursue a new career in sales.

Tammy said that after Jake had bitten Paul's daughter, Paul called her. When she heard about that bite, she began sobbing because she was upset that Jake had bitten and had hurt someone. When asked whether she had told Paul, "Put the dog down! Put it down! It's already bitten a child; now it's bitten your own daughter! Put the dog down!" she responded, "When emotions were high, yes, I did."

Sometime later when Tammy took one of her other dogs to the vet, the vet told her that he had been contacted by Paul. The vet told her that the conversation was

> regarding Jake's temperament and that Jake was not an aggressive dog, but that he was a fear biter, and that he's either, you know, fight or flight. That's typical with animals. If they're scared, they're either going to run[,] or they're going to react. And he was a "react."
>
> . . . .
>
> Q. . . . Did the vet indicate to you in that conversation by implication that he did not tell [Paul] to put the -- the dog down?
>
> A. I don't -- It's been so many years, I don't remember exactly if my vet recommended that he put him down. I do not remember that.
>
> Q. Do you remember if the vet told you that he told [Paul] to get the dog fixed?
>
> A. Yes. My vet did say that.
>
> Q. In fact, you had -- you had made the same recommendation to [Paul] after he called you, correct?

A. I had asked if he had him fixed.

Q. Okay. . . . Certainly you would agree that if the vet said[,] "I told [Paul] to get the dog fixed," that would imply not putting the dog down, correct?

A. That is correct.

On redirect examination, Brittney's counsel attempted to get the name of the boy who had been bitten at her day care. Brittney's counsel also made assumptions about what had happened to the boy who was bitten, but Tammy corrected him, saying that she was not aware of scarring and that she had only assumed that he had received stitches:

Q. This child, he was scarred badly enough that it traumatized you to the point that you closed down your day care. Is it surprising to you that you don't remember the child's name?

A. No.

I don't -- I don't know what you're -- what you're implying here.

When you say he was scarred, he was bit[ten]. I never saw the child after that day. I don't know how his scars were.

Is that what you're --

Q. Well, he had stitches.

A. I'm assuming he had to have stitches.

### 5. The Veterinarian's Testimony

Dr. Bruce Fusselman testified that he had seen Jake when Jake lived with Tammy. Brittney's counsel asked about the incident involving the child who was

19

bitten at Tammy's day care, but due to the time that had elapsed, he did not remember the dog and could only assume that "it had to be this dog":

Q. And did you learn at some point that -- that the dog had mauled a child in her home day care?

A. She was a client back then and had called me that a dog of hers -- that she had had a day care -- had done something to a child. But I wasn't -- My recollection is -- I don't remember which one, but obviously, from what you're saying, it -- it had to be this dog.

Q. This is many years ago; is that right?

A. Many. Last time, apparently, I saw the dog was 2011.[9]

According to Dr. Fusselman, regardless of what the child did to the dog prior to the incident, he would consider the dog to be abnormally dangerous. Dr. Fusselman's belief was that a dog that bites a child's face does not have a disposition that can be fixed and that it should be euthanized. Dr. Fusselman testified that it would not have been his recommendation to neuter the dog because it would not change the dog's behavior. Dr. Fusselman, however, admitted that he did not recall having a conversation with Paul about this. Dr. Fusselman claimed that if he

---

[9]Although Dr. Fusselman had reviewed his records and found Jake listed under Tammy's last name, he said that the records provided only "computer information as to what services were provided [to] the dog"; he did not have information on Jake's demeanor. Without such information or any specific recollection of Jake, Dr. Fusselman did not provide any testimony related to any specific behavior or demeanor that he had observed in Jake. As to Jake's breed, Dr. Fusselman confirmed that a Goldendoodle is a cross between a Golden Retriever and a Standard Poodle and claimed generally that "many of these dogs [Goldendoodles] are not getting th[e] benefit of the temperament" of a Golden Retriever.

20

had received a call from Paul regarding a second attack, his recommendation would have been to euthanize the dog.

On cross-examination, Appellants' counsel questioned Dr. Fusselman about whether Paul's and Tammy's testimony about his prior recommendation to neuter was a lie:

Q. Okay. So in ten years -- the ten years that it's been since 2011, if we do the math[ of your seeing approximately 1,500 animals per year], that's 15,000 patients that you've interacted with -- ballpark -- correct?

A. Possibly more.

Q. And if the testimony in this case by Tammy . . . is that she talked to you and you told her that you told [Paul] to get the dog fixed, and if [Paul] testified that he [had] spoke[n] with you and you [had] told him to get the dog fixed, you would agree that that's one conversation that they remember about one dog rather than trying to remember something about 15,000 dogs, correct?

A. If -- If they say I had that conversation with -- with them, I -- I very possibly could have.

Q. Okay. You're certainly not saying that -- If both Tammy . . . and Paul . . . said that you told them to -- that -- that you had told [Paul] that the dog needed to be fixed, you're not saying that either one of them is lying or that their memory is inaccurate, correct?

A. No, sir.

. . . .

Q. Do you remember telling [Tammy] that you told [Paul] that dogs fall into the category of "fight" or "flight" and that Jake was a -- a fear biter?

A. I guess I'm at a loss.

I -- I do not recall any ownership of this dog other than Tammy . . . .

Q. And -- And so you also don't recall telling [Paul] that Jake was a fear biter?

A. I do not recall that.

. . . .

Q. But, again, with -- with regard to the comment and the testimony in this case that you said that Jake was a fear biter, if Tammy . . . testified that that's what you told her, you're not disagreeing with her testimony or saying that she's wrong or remembering that conversation incorrectly, are you?

A. No, sir.

Q. And if [Paul's] testimony is that you specifically told him that Jake was a fear biter, you're not saying that [Paul] is wrong or is misremembering the conversation, correct?

A. No, sir.

Q. That is correct?

A. That is correct.

Q. You just don't remember the conversation.

A. That is correct.

Appellants' counsel asked whether Dr. Fusselman recalled an incident of the child's being bitten, and he said that he recalled that one of Tammy's dogs had bitten a child who was in her day care, but he could "only assume that it was this dog we're talking about." He did not know any of the details about that bite. Appellants'

counsel supplied some of the details and questioned Dr. Fusselman further about his opinion on whether Jake's behavior was abnormal:

> Q. In either one of those conversations[ when you met with Brittney's counsel after you were subpoenaed], did he tell you what happened when that child got bit, the child that was under [Tammy's] care?
>
> A. He used the phrase "a mauling of the face."
>
> Q. Did he explain to you the -- the child had climbed onto Jake's back, had wrapped his arms around Jake's neck and had wrapped his legs around Jake's body and was riding Jake like a horse?
>
> A. That was not shared with me.
>
> Q. You think that it should have been shared with you? That would make a difference in your opinion, wouldn't it?
>
> A. Not entirely.
>
> Q. Okay. Do you think that it's abnormal for a dog who has a child who has climbed on his back, that's holding onto his neck and has his legs wrapped around his body -- do you think that it's abnormal for a dog in that situation to be afraid?
>
> A. Dogs have such a variety of individual -- individual personalities. I -- How each one responds is totally individual.
>
> > [APPELLANTS' COUNSEL]: I object as nonresponsive.
> >
> > THE COURT: I'll sustain the objection.
> >
> > If you would, just listen to the question and --
> >
> > . . . .
> >
> > THE COURT: -- answer the question, and then he'll give you the next question. Thank you.

23

Q. . . . My question is: It would not be abnormal for a dog who has a child on his back for that dog to be afraid, would it?

A. That is possible.

. . . .

Q. That in and of itself -- A dog who has a child on his back, who is trying to get away and bites the child, that would not make that dog in and of itself abnormally dangerous, would it?

A. If the dog nipped the child and sought to run away, that would be the typical response I think most dogs would give.

Appellants' counsel also questioned Dr. Fusselman about Jake's response to being slapped and kicked by the Herchmans' daughter:

Q. And if -- if a dog was --

You understand that dogs can get riled up, wound up playing, correct?

A. Yes, sir.

Q. Okay. And if a dog got riled up playing and then was slapped and kicked, it would not be abnormal for that dog to be afraid, would it?

A. Yes, sir.

Q. Okay. And -- And I think we can agree -- You would certainly agree that a dog shouldn't be kicked, correct?

A. No, sir.

Q. And a dog shouldn't be hit at, correct?

A. No, sir.

Q. And if a dog who is used to being petted and snuggled is hit or kicked, that could cause fear in the dog.

24

A. Yes.

Q. And -- And if that dog in response bit, that would not be an abnormal reaction, correct? It might not be the normal reaction, but it wouldn't be abnormal either.

A. Yes.

On redirect, Brittney's counsel stated that no one had witnessed the attack at the day care but gave his own description of the event and questioned Dr. Fusselman about his opinion on Jake's behavior:

Q. If -- If a dog -- Let's just take the example of the three-year-old [boy] in the day care that nobody actually witnessed being attacked -- but let's just say that the dog had ripped both sides of the kid's face to where he had stitches going down both sides of his lip and obviously bit at least twice because the kid also had wounds on [his] head. Would you regard that as an attack or a nip or a defensive bite?

A. That sounds like an attack.

Q. And it's not normal for any dog to attack a child no matter what the child did to it; would you agree with that?

A. As a society, we don't call that normal.

Brittney's counsel also allowed Dr. Fusselman to reiterate his stance on how neutering would not correct aggressive behavior:

Q. Now, the whole business about the conversation with the Herchmans and you said that you couldn't disagree, you don't remember the conversation at all, do you?

A. I do not specifically.

Q. If you had --

And when I told you about this and what their story was, did you find it very puzzling to hear that they were saying that you recommended neutering?

A. Well, I would say this: 80, 90 percent plus of -- of my patients are neutered. So for me to recommend neutering is pretty standard procedure. But to say that neutering is going to somehow change and -- and correct an aggressive behavior in a dog, I would never give an indication that that's the likelihood.

Q. So in other words, you can't disagree if -- if there is a comment saying that you recommended neutering; but what you can strongly disagree with is anybody saying that you would have given that advice -- that advice to -- to solve the problem of a dangerous dog. Is that fair?

A. Yes, sir.

Q. Because you -- No matter what -- No matter what you remember or don't remember, you would never give that advice as a solution to a dangerous dog.

A. No, sir.

Q. If you had been told that the dog had actually mauled a child in a day care, biting it repeatedly in the face, leaving wounds on the child after the dog had chased somebody to a truck, ripped his pants, made the guy jump into the truck, and when it went to the new home, the Herchmans' home, had bitten their daughter not once but twice, biting her once leaving a scar that required stitches when she shoved it and kicked it to get it away, it lunged again and latched on and left a J-shaped scar[10] on her forearm that sent her to the hospital, would you have ever given any advice other than this dog needs to be euthanized?

---

[10]Brittney's counsel used this phrasing, but when he had questioned Paul about "the family joke . . . that the dog [had] left its initials" and that LeAnn had "a big J-shaped scar," Paul said that he had never heard that and did not recall the shape of her scar. Similarly, Donna did not confirm the shape of LeAnn's scar; she said that LeAnn "has a massive scar across her arm from childhood surgery." Only Brittney testified that Jake's bite had left a "'J' mark" on LeAnn's arm.

26

A. No, sir.

## D. Sufficiency Analysis of Strict-Liability Claim

### 1. Legal-Sufficiency Analysis

As explained above, in evaluating the legal sufficiency of the evidence, I will focus on evidence favorable to the dangerous-dog finding and disregard contrary evidence. A summary of the evidence favorable to the dangerous-dog finding follows:

- The veterinarian testified that no matter what the child at the day care had done to Jake, the veterinarian would have regarded Jake as abnormally dangerous due to the attack on the child;

- The veterinarian believed that a dog who attacks a child should be euthanized;

- The veterinarian also believed that he would have told Paul to euthanize Jake after he had bitten LeAnn;

- Tammy told Paul to euthanize Jake after she learned that he had bitten his daughter;

- Donna said that "there was something abnormal" about Jake after he had bitten LeAnn; and

- Paul agreed that it was not normal for a dog to have "sent three people to the hospital."[11]

---

[11]Brittney's counsel, who represented her at trial and also represents her on appeal, posed questions to witnesses about whether Jake was abnormally dangerous and consolidated the attack on Brittney with the two prior attacks. Similarly, in Brittney's appellate brief, her counsel argues that "the viciousness of the attack itself" is more than a scintilla of evidence to support a reasonable inference that the dog had dangerous propensities "of which Appellants were aware prior to [Brittney's] mauling." This, however, begs the question of how the unprovoked attack on Brittney would have been foreseeable by Appellants.

Using the legal-sufficiency lens, there is more than a scintilla of evidence that Jake had dangerous propensities abnormal to his class. *Cf. Osburn v. Baker*, No. 04-19-00568-CV, 2020 WL 2441426, at *2 (Tex. App.—San Antonio May 13, 2020, no pet.) (mem. op.) (holding, in summary-judgment appeal, that there was more than a scintilla of evidence that dog had dangerous propensities abnormal to his breed because dog refused to take commands, was "too playful" to serve as a working dog, was known to be particularly possessive of his family, was leery around strangers, and had nipped at people's ankles and heels); *Edmonds v. Cailloux*, No. 04-05-00447-CV, 2006 WL 398033, at *2–3 (Tex. App.—San Antonio Feb. 22, 2006, no pet.) (mem. op.) (holding, in summary-judgment appeal, that there was more than a scintilla of evidence to support elements of strict-liability claim because dog had snapped at a person, had run through the house, had knocked down a person on two occasions, had gone "bizzerk" [sic] when it saw birds or squirrels, was unpredictable, and was described as "crazy" and "vicious"). Accordingly, I conclude that the portion of Appellants' first issue challenging the legal sufficiency of the evidence to support the jury's dangerous-dog finding should be overruled.

### 2. Factual-Sufficiency Analysis

When engaging in a factual-sufficiency analysis, a reviewing court considers and weighs all the pertinent record evidence. So in addition to the evidence set forth in the preceding subsection that was favorable to the dangerous-dog finding, a reviewing court considers and weighs the following:

- With regard to the bite that occurred at the day care, Paul was told by Tammy that Jake had nipped the child to get the child off his back—not that the child had been "mauled," had rips on his head and mouth, and had stitches on his face;

- Paul believed that Jake's behavior toward the child was a normal reaction and thought that "any dog would probably want to get a child off [its] back";

- Similarly, the veterinarian said that if the dog had nipped the child and had sought to run away, "that would be the typical response I think most dogs" would give after a child was on its back;

- The child's mother admitted that "her child had done wrong" by trying to ride the dog like a horse;

- Tammy testified that she never saw the child after the incident, so she had no idea if he had scarring and had only assumed that he had received stitches for his injuries;

- After Tammy reported the incident to the day care's state regulatory agency, she was not required to close her day care for even one day, nor did they require her to get rid of Jake;

- Tammy said that no one—not the vet, the state regulatory agency, the city, or anyone else—had told her that she needed to euthanize Jake after the child had been bitten;

- When Tammy picked up Jake from animal control, the people there said that they had fallen in love with Jake;

- The photos admitted into evidence demonstrated that while Jake was in Appellants' care, he had been around numerous people, including children, and had not attacked them but rather had acted as a lapdog and always wanted to be petted;

- Jake had not shown aggression toward any guests and interacted well with Paul and Donna's friends;

29

- Appellants had not been warned by neighbors that Jake had shown aggression or that they feared him;

- When Paul tethered Jake in the front yard while doing lawn work, Jake did not show aggression toward people who approached;

- Although Jake barked at delivery men and squirrels, he "was pretty good on walks" and did not bark at other dogs;

- As between the two dogs in Appellants' household, the Maltipoo Lexi was the alpha dog and the lead barker;

- Jake was not aggressive toward Lexi;

- The evidence demonstrated that LeAnn had taken responsibility for the incident when she was bitten by Jake;

- After LeAnn was bitten, Jake was quarantined for ten days with animal control, but there was no dangerous-dog hearing;

- An animal control employee told Paul not to euthanize Jake because the employee thought that Jake was a good dog and wanted to have him as his pet;

- Paul testified that he had called Tammy after the incident with LeAnn to obtain the name of Jake's prior veterinarian, and Tammy told him to do what he needed to do and that she would understand if he felt like he needed to euthanize the dog;

- According to Donna, the veterinarian had told Paul that Jake was a fear biter and that they needed to get him neutered to help with that;

- Tammy also testified that the veterinarian had told her that he had recommended that Paul get Jake fixed, which would imply not putting the dog down;

- Tammy further testified that the veterinarian had told her that Jake "was not an aggressive dog[] but that he was a fear biter," which was "typical with animals";

- Although Donna believed that there was something abnormal after the second bite involving LeAnn, she did not consider Jake abnormally dangerous;

- The last time that the veterinarian had seen Jake was approximately ten years prior to the trial, and he did not recall which of Tammy's dogs "had done something to a child" but assumed it "had to be this dog";

- Similarly, the veterinarian had no recollection of having a conversation with Paul after Jake had bitten LeAnn;

- The veterinarian testified that he "very possibly could have" told Paul to get the dog fixed after LeAnn's bite;

- The veterinarian agreed that it would *not* be abnormal for a dog to bite if it were hit and kicked;

- Trace testified that no one had ever expressed to him that Jake was dangerous;

- Trace thought Jake's response to LeAnn's hitting and kicking him was not abnormal;

- Three years elapsed between the time that Jake had responded to LeAnn's hitting and kicking him by biting her and when he had attacked Brittney;

- With regard to Brittney's prior interactions with Jake, the evidence showed that she had been to the house on a prior occasion and had petted Jake without incident, and thus Jake was familiar with her;

- On the night that Brittney was attacked, she and Trace had been at the house for some time petting Jake and drinking wine before the incident;

- The record demonstrates that Jake did not bark or give any warning before he attacked Brittney;

- Trace believed that Brittney's movement in reaching for her wine glass had startled Jake and that he went for the closest object, which was Brittney; and

- When Brittney's counsel questioned Paul about whether Jake (who had, according to Brittney's counsel, "sent three people to the hospital") was abnormally dangerous, Paul did not agree that the incidents made Jake abnormally dangerous, only that the incidents were not normal.

Looking at the whole record, it is clear that the two biting incidents prior to Jake's attack on Brittney were provoked and thus would not have put Appellants on notice that Jake, who was normally not aggressive toward Appellants' friends, was a dangerous dog who was likely to attack Brittney after she had been petting him without incident for some time before the attack occurred. *See generally* Tex. Health & Safety Code Ann. § 822.041(2) (defining "[d]angerous dog" in terms of unprovoked attacks). Additionally, no dangerous-dog hearing was held after the second quarantine to declare Jake a dangerous dog. Moreover, neither Tammy nor Appellants had been told by animal control or the veterinarian that Jake was abnormally dangerous. Instead, animal control expressed to Tammy after the first bite and to Appellants after the second bite that they loved the dog and did not want him to be put down, and the veterinarian's recommendation following the second bite (as testified to by both Paul and Tammy) was for Jake to be neutered. Paul therefore had both animal control in Grapevine (explicitly) and the veterinarian (implicitly through his recommendation to neuter the dog) tell him not to euthanize the dog after the second bite; thus, it was a reasonable inference that Paul would put more weight in their experience-based recommendations than in Tammy's emotional outburst, during which she told him to put the dog down. Furthermore, the veterinarian's testimony was merely hypothetical

32

as he had no recollection of speaking to Paul and had no personal recollection of Jake because he had not seen him for over ten years and had seen approximately 15,000 animals since then.

I also note that statements were injected into the trial that are not evidence. More than twenty times during the trial—from his opening statement, throughout his questioning of the witnesses, and in his closing argument—Brittney's counsel said that the child at day care was "mauled" by Jake. The record further demonstrates that Brittney's counsel had met with the veterinarian twice about the case after he was subpoenaed and had used the phrase "a mauling of the face" when telling him what had happened to the child at Tammy's day care. Brittney's counsel's statements do not constitute evidence, and such term was not used by Tammy when she described the bite.

After considering and weighing all the pertinent record evidence, I would hold that the evidence supporting the dangerous-dog finding is so weak or is so against the great weight and preponderance of the evidence that the finding is manifestly unjust. *Cf. Bowman v. Davidson*, No. 06-14-00094-CV, 2015 WL 3988675, at *2, *4–5, *8 (Tex. App.—Texarkana July 1, 2015, no pet.) (mem. op.) (holding evidence factually sufficient to support jury's finding that owners did not have reason to know that their dog had dangerous propensities even though the dog had previously bitten someone who had "moved too fast" and even though "there were clearly red flags" because the dog was very protective of female owner and aggressive toward strangers; veterinarian

33

behaviorist testified that she would not have considered the dog to be dangerous until it had bitten the second person); *cf. also Gonzalez v. Ahrens*, No. 14-18-00417-CV, 2019 WL 4071925, at *4 (Tex. App.—Houston [14th Dist.] Aug. 29, 2019, no pet.) (mem. op.) (holding evidence factually sufficient to support trial court's implied finding regarding owner's lack of knowledge of pet sheep's dangerous propensities despite evidence that owner knew about his pet's tendency to butt when provoked or agitated). I would therefore sustain the portion of Appellants' first issue challenging the factual sufficiency of the evidence to support the jury's dangerous-dog finding.

### E. Sufficiency Analysis of Negligence Claim

#### 1. Legal-Sufficiency Analysis

As set forth in the applicable-law section above, the crux of Brittney's negligent-handling claim is whether the injuries were caused by the animal in a place where it had a right to be. That is the case here: Jake had a right to be in Appellants' backyard at the time of the incident. Brittney therefore was required to show more than a scintilla of evidence that Appellants knew or should have known of Jake's dangerous nature. My analysis therefore turns on the holdings above regarding the sufficiency of the evidence to support the dangerous-dog finding. Because I have held that there is more than a scintilla of evidence to support the jury's dangerous-dog finding, I would likewise hold that there is more than a scintilla of evidence that Appellants knew or should have known of Jake's dangerous nature. *Cf. Osburn*, 2020 WL 2441426, at *3 (holding that trial court erred by granting a no-evidence summary

34

judgment on a claim for negligent handling of an animal when the evidence showed that the owners knew the way their dog acted around strangers put strangers at risk but they chose to leave their dog loose and, as a result, their dog bit an individual who came to the home to provide a quote). Accordingly, I would overrule the portion of Appellants' first issue challenging the legal sufficiency of the evidence to support the jury's negligence finding.

### 2. Factual-Sufficiency Analysis

My factual-sufficiency analysis of Brittney's negligent-handling claim similarly turns on the holding above that the evidence is factually insufficient to support the jury's dangerous-dog finding. Appellants were aware that Jake would bite if he were ridden like a horse, hit, or kicked, but up until Jake bit Brittney, they had no knowledge that he would bite without provocation.[12] Without such knowledge, Appellants are not negligent because the injury occurred in their backyard—a location where Jake had a right to be. *See Petry v. Gasca*, No. A14-93-00433-CV, 1994 WL 132772, at *3 (Tex. App.—Houston [14th Dist.] Apr. 14, 1994, no writ) (not designated for publication) (reversing judgment awarding damages for dog bite because owner could not have reasonably foreseen that the dog would cause injury and therefore had no duty to protect appellee from an unanticipated attack by the dog); *cf. Jones*, 2005 WL 503182, at *4–5 (collecting cases holding that dog owners

---

[12]For purposes of this analysis, I assume that Brittney's action in reaching for her wine glass was not an attempt to provoke Jake.

were not negligent if the injury occurred where the dog had a right to be and the owner did not have knowledge of the dog's dangerous propensities).  I would conclude that the evidence supporting the negligence finding is so weak or is so against the great weight and preponderance of the evidence that the finding is manifestly unjust, and I would sustain the remainder of Appellants' first issue challenging the factual sufficiency of the evidence to support the jury's negligence finding.

### III.  Conclusion

"We walk a fine line on factual[-]sufficiency review, mindful both of our duty not to merely substitute our judgment for that of the jury while at the same time recognizing that our strong deference to a jury's verdict does not make that verdict totally unreviewable."  *Cartwright v. Armendariz*, 583 S.W.3d 798, 803 (Tex. App.— El Paso 2019, pet. denied).  My able colleagues in the majority fall on one side of the line in their conclusion that the evidence is factually sufficient to support the jury's liability findings; I fall on the other side of that line.  Thus, I was compelled to detail the testimony and express my dissent.  I would overrule Appellants' legal-sufficiency challenge but sustain their factual-sufficiency challenges to Brittany's claims and would, therefore, reverse the judgment and remand the case for a new trial.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  November 27, 2024

36